IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CASE NO. 5:20-CV-00018-M

| | | |
|---|---|---|
| ROBERT WHITMIRE, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| SOUTHERN FARM BUREAU LIFE | ) | |
| INSURANCE COMPANY, | ) | |
| Defendant. | ) | |

Plaintiff Robert Whitmire ("Plaintiff"), as beneficiary, filed suit seeking the enforcement

of a $500,000 policy issued by Defendant Southern Farm Bureau Life Insurance Company

("Defendant") insuring the life of Susan Whitmire, Plaintiff's deceased wife ("Mrs. Whitmire").

This matter is before the court on the parties' cross motions for summary judgment [DE-35 and

DE-39], which have been fully briefed. For the reasons that follow, the Plaintiff's motion [DE-35]

will be denied and the Defendant's motion [DE-39] will be granted.

I.      Factual and Procedural Background

Plaintiff is a North Carolina resident, living in the Eastern District of North Carolina.

Compl. ¶ 2, DE-1. Defendant is a Mississippi corporation with a corporate office in Jackson and

offers insurance coverage in eleven states, including North Carolina and South Carolina. *Id.* ¶ 4;

*see also* Corporate Website, https://www.sfbli.com/ (last visited May 5, 2021). The case is in

federal court pursuant to diversity jurisdiction. DE-1 ¶ 5. The following recitation of the factual

background was obtained from Defendant's Statement of Material Facts [DE-40] submitted in

support of its motion and largely undisputed by Plaintiff. The limited points of dispute are indicated

below [DE-44].

The relevant life-insurance policy ("Policy") was issued by Defendant on May 23, 2005, with a face amount of $500,000. DE-40 ¶ 1. Mrs. Whitmire's application for insurance, dated April 16, 2005, was attached to and made part of the Policy. *Id.* ¶ 2. In Section 1 of the application, Mrs. Whitmire was identified as the "Proposed Insured." *Id.* ¶ 3. Mrs. Whitmire's address at the time of application was listed as 205 Hyde Park Drive, Goldsboro, NC, 27530. *Id.* ¶ 4. Section 2 of the application, titled "Owner (Complete only if owner is other than the proposed insured)" was left blank. *Id.* ¶ 5. Section 3 of the application, titled "Premium Payor (Complete only if premium payor is other than owner)" also was left blank. *Id.* ¶ 6. Section 4 of the application, titled "Beneficiary," named Plaintiff as the primary beneficiary of benefits payable under the Policy. *Id.* ¶ 7. Section 12 of the application, titled "Premium," provided that premium notices were to be sent to the Policy's "Proposed Insured" and "Owner." *Id.* ¶ 8. Mrs. Whitmire was the Owner of and Premium Payor for the Policy. *Id.* ¶ 9. Section 12 of the application also lists Plaintiff's name above the line for "Depositor/Premium Payor," DE-44 ¶¶ 8-9, apparently written in by Mrs. Whitmire, DE-49 ¶ 8. Regarding payment of premiums, the Policy provided that "[a]ll premiums are due and payable in advance at [Defendant's] Home Office." DE-40 ¶ 10. The Policy contained a "Grace Period" provision which stated: "[a] grace period of 31 days will be allowed for the payment of each premium after the first. This policy will continue in force during the grace period. If any premium due remains unpaid at the end of the grace period, this policy will lapse as of that premium's due date." *Id.* ¶ 11. The Policy also contained a "reinstatement" provision stating "[t]his policy may be reinstated within five years after the date of lapse and before the final expiry date if each of the following conditions is satisfied: (a) Satisfactory evidence of insurability of the Insured is furnished . . . ; and (b) all overdue premiums are paid with interest from the due date of each

2

premium, at the rate of 6% per year, compounded annually." *Id.* ¶ 12. Premiums for the Policy were payable semi-annually, in May and November. *Id.* ¶ 13.

Beginning in 2005, Defendant mailed Notices of Premium Due addressed to Mrs. Whitmire at 205 Hyde Park Drive, Goldsboro, NC 27530, each May and November. *Id.* ¶ 14. From 2005 to May 2016, all but one of the premiums were paid by personal check from a checking account jointly owned by Plaintiff and Mrs. Whitmire. *Id.* ¶ 15. On or about May 21, 2016, Mrs. Whitmire filed an Official Individual Mail Forwarding Change of Address Order with the United States Postal Service ("USPS"), changing her address to 2506 Celanese Road, Apt. A, Rock Hill, South Carolina 29732. *Id.* ¶ 16. Defendant received notice of Mrs. Whitmire's change of address from the USPS on June 3, 2016. *Id.* ¶ 17. The USPS confirmed to Defendant that Mrs. Whitmire's change of address was an Individual Permanent record. *Id.* ¶ 18. On June 6, 2016, Defendant sent an Internal Audit Address Change Confirmation to Mrs. Whitmire at her Hyde Park Drive address in North Carolina. *Id.* ¶ 19. The Address Change Confirmation stated: "our records indicate that your address has recently changed. If you **did not** request a change of address, please call the toll[-]free number or send an email to the address below." *Id.* ¶ 20. Neither Mrs. Whitmire nor Plaintiff contacted Defendant in response to this correspondence. *Id.* On June 7, 2016, Defendant sent a letter to Mrs. Whitmire's South Carolina address stating: "[w]e have recently received notification of your change of address and hope you are enjoying your new home. Although your servicing agent on your existing life insurance policy has not changed, we do want to make you aware of the Farm Bureau agency located in your area . . . . Please be sure to contact this agency if you need any assistance." *Id.* ¶ 21. This letter was not returned as undeliverable, and Mrs. Whitmire did not contact Defendant in response. *Id.* ¶ 22. Furthermore, Mrs. Whitmire never proactively contacted Defendant during the span of the Policy. DE-44 ¶ 22.

3

On November 7, 2016, Defendant sent a semi-annual Notice of Premium Due to Mrs. Whitmire at her Rock Hill, South Carolina address. DE-40 ¶ 22. The due date for this premium was November 23, 2016. *Id.* ¶ 23. This Notice was not returned as undeliverable, and the November 2016 premium was not paid. *Id.* On December 28, 2016, Defendant sent a Notice of Lapse to Mrs. Whitmire at her Rock Hill, South Carolina address, noting that it had not received the premium payment due on November 23, 2016, and that the Policy's grace period had expired. *Id.* ¶ 24. Defendant extended a "special offer" to keep the Policy in force if the premium payment was made by January 22, 2017. *Id.* ¶ 25. The premium was not paid. *Id.* On January 27, 2017, Defendant sent a letter to Mrs. Whitmire at the Rock Hill, South Carolina address, informing her that the Policy had lapsed and encouraging her to consider applying for reinstatement of the coverage. *Id.* ¶ 26. Mrs. Whitmire did not apply to reinstate coverage. *Id.* ¶ 27. Mrs. Whitmire passed away in South Carolina on March 10, 2017. *Id.* ¶ 40.

The following, though not material to the question before the court, provides context and additional detail regarding Mrs. Whitmire's move to South Carolina. Plaintiff and Mrs. Whitmire entered into a Separation Agreement on April 12, 2016. *Id.* ¶ 28. As set forth in the Agreement, Plaintiff and Mrs. Whitmire separated as of March 29, 2016, and "intended to live separate and apart permanently." *Id.* ¶ 29. The Separation Agreement contained a paragraph pertaining to "Life Insurance" stating:

> The Husband and Wife agree that each shall keep his/her individual life insurance policy/policies as his/her respective sole and separate property. Each shall be responsible for any premium associated with his/her respective life insurance policy from the date of the execution of this document forward. The Husband and Wife further agree that he/she shall each be allowed to name beneficiaries on his/her respective life insurance policy of his/her own choosing.

*Id.* ¶ 30. Plaintiff notes that even after signing the Separation Agreement, he paid the Policy's May 2016 premium. DE-44 ¶ 30. On March 31, 2016, two days after Plaintiff and Mrs. Whitmire

4

separated, Plaintiff removed Mrs. Whitmire as the beneficiary of his own life insurance policy, citing "Divorce." DE-40 ¶ 31. Plaintiff also removed Mrs. Whitmire from his North Carolina Farm Bureau automobile insurance on April 27, 2016. *Id.* ¶ 32. Similarly, as of June 1, 2016, Plaintiff changed the beneficiary of his employer-sponsored group life insurance from Mrs. Whitmire to his son from a previous marriage, Eric Whitmire. *Id.* ¶ 33. Plaintiff never re-named Mrs. Whitmire as his life insurance beneficiary nor did he relist her an additional insured on his automobile insurance. *Id.* ¶ 34.

On June 17, 2016, Mrs. Whitmire surrendered her North Carolina driver's license and was issued a South Carolina driver's license, listing her address as: 2506 Celanese Road, Apt. A, Rock Hill, South Carolina 29732-1698. *Id.* ¶ 35. There is no evidence that Mrs. Whitmire subsequently surrendered her South Carolina driver's license or that she obtained another North Carolina driver's license before she passed away. *Id.* ¶ 36. There is also no evidence that Mrs. Whitmire submitted another change-of-address form to the USPS to indicate that she moved back to North Carolina. *Id.* ¶ 37. Mrs. Whitmire's bank statements from BB&T for the period of April 2016 through March 31, 2017, list her address as: 2506 Celanese Road, Apt. A, Rock Hill, South Carolina 29732-1698. *Id.* ¶ 38. Similarly, Mrs. Whitmire's automobile insurance records prepared by Nationwide between May 4, 2016, and March 17, 2017, including South Carolina Insurance Identification cards and policy renewal documents, list her address as: 2506 Celanese Road, Apt. A, Rock Hill, South Carolina 29732-1698. *Id.* ¶ 39.

Plaintiff posits that the reason Mrs. Whitmire was in South Carolina at the time of her death was because she was visiting her father after he had suffered a cardiac event. DE-44 ¶ 40. Mrs. Whitmire's South Carolina Death Certification listed the place of death as: 826 Garrison Road, Georgetown, South Carolina 29440. DE-40 ¶ 41. The Death Certification listed Mrs. Whitmire's

residence address as: 205 Hyde Park Drive, Goldsboro, North Carolina 27530. *Id.* ¶ 42. The Death Certification identified the "informant" as Plaintiff. *Id.* ¶ 43. On March 16, 2017, Plaintiff contacted Defendant's local agent, Steve Sutton, to inform him of Mrs. Whitmire passing and to make a claim for benefits under the Policy. *Id.* ¶ 44. Mr. Sutton advised him that the Policy's November 2016 premium was not paid and that the Policy had therefore lapsed. *Id.* ¶ 45. Plaintiff indicated to Mr. Sutton that he and Mrs. Whitmire had "reconciled" and that Mrs. Whitmire had moved back to North Carolina, *id.* ¶ 46, though the exact timeline is unclear, see DE-44 ¶ 29 (listing text messages from February and March 2017, prescription bottles dated December 2016, and a sworn affidavit from a neighbor as corroborating evidence that Mrs. Whitmire did in fact move back to North Carolina sometime after the Spring 2016 separation).[1] This was the first time Plaintiff stated to any employee or agent of Defendant or North Carolina Farm Bureau that Mrs. Whitmire allegedly moved back to North Carolina, and at no time did Mrs. Whitmire inform Defendant that she had moved back to North Carolina. DE-40 ¶ 47. However, Mrs. Whitmire never directly informed Defendant of her move to South Carolina in the first instance. DE-44 ¶ 47. Mr. Sutton had not been previously informed that Plaintiff and Mrs. Whitmire "reconciled" or that she moved back to North Carolina. DE-40 ¶ 48. Rather, Plaintiff came into Mr. Sutton's office on April 27, 2016, to remove Mrs. Whitmire from his automobile policy stating that "she no longer lived in the home," Plaintiff did not add Mrs. Whitmire back to his automobile policy, and Plaintiff spoke with Mr. Sutton in February 2017 and did not mention Mrs. Whitmire. *Id.* ¶ 49. While there is a factual dispute regarding if and when Mrs. Whitmire moved back to North Carolina before her

---

[1] Defendant argues that "the text messages should be deemed inadmissible and excluded from evidence," because the Plaintiff "spoliated" the phone from which they were taken, and that the affiant's information should be disregarded because it was not based on personal knowledge. DE-49 ¶ 29. Because the court finds the actual location of Mrs. Whitmire's residence immaterial, it will not address these arguments.

6

demise in March 2017, the court finds this to be immaterial to the question before it. Furthermore, Plaintiff conceded that Mrs. Whitmire was living in South Carolina in November 2016—the time of relevance, as will be explained below, regarding the notice on nonpayment of premium due. *See* DE-1 ¶ 27 ("Plaintiff and Insured moved back in together after Christmas 2016.").

By letter dated April 27, 2017, Defendant informed Plaintiff that his claim for benefits was denied because the Policy lapsed due to the non-payment of a premium. DE-40 ¶ 50. Defendant indicated it had received notice of Mrs. Whitmire's move to South Carolina and had sent all correspondence to her new address there. *Id.* ¶ 51. Defendant enclosed copies of all of the correspondence previously mailed to Mrs. Whitmire, including the premium and lapse notices. *Id.* ¶ 52.

Plaintiff filed suit in this court on January 16, 2020, after several failed attempts at settlement negotiations. *See* DE-1 ¶¶ 75-98. Plaintiff raises several causes of action: declaratory judgment that the Policy is in full force and effect (count 1); breach of contract (count 2); unjust enrichment (count 3); breach of implied covenant of good faith and fair dealing (count 4); bad faith in settlement discussions, which took place prior to initiating suit (count 5); and unfair or deceptive trade practices (count 6). *Id.* ¶¶ 35-108. This matter was last before the undersigned on a Motion to Transfer Venue [DE-12] to the District of South Carolina, which was denied on May 20, 2020 [DE-23]. It is now before the court on cross motions for summary judgment [DE-35 and DE-39]. The cross motions raise the same arguments. Broadly, Plaintiff argues that because Defendant failed to comply with North Carolina's applicable statute, N.C. Gen. Stat. § 58-58-120 "Notice of nonpayment of premium required before forfeiture," by sending notices to Mrs. Whitmire's last-known address in North Carolina (and instead sent notices to her then-current address in South Carolina), the Policy was improperly forfeited and the Plaintiff impermissibly denied benefits.

Defendant argues that it was not required to comply with North Carolina's statute in the first instance. Mrs. Whitmire moved to South Carolina one year prior to her demise (due to an abusive relationship with Plaintiff) and remained a resident of South Carolina until her untimely passing. Because all relevant communications regarding the lapse in payment were mailed to the South Carolina residence, the Policy was properly forfeited and all of the Plaintiff's claims necessarily fail as a matter of law. Defendant also argues that Plaintiff's interpretation of the relevant North Carolina statute should be barred by the absurdity doctrine. Though Plaintiff requested oral argument on his motion, see DE-38 at 1, the court finds that oral argument will not facilitate the decisional process regarding the question central to both motions for summary judgment, which is a question of statutory interpretation.

II.     Legal Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *see also* Fed. R. Civ. P. 56(c). The standard of review does not change when ruling on cross-motions for summary judgment. The motions are evaluated separately against the Rule 56 standard. *Monumental Paving & Excavating, Inc. v. Pa. Mfrs.' Ass'n Ins. Co.*, 176 F.3d 794, 797 (4th Cir. 1999).

III.    Analysis

A.  Preliminary Considerations

1. Abstention

Though not raised by either party, and for reasons that will be apparent below, see *infra* Part III.C., the court carefully considered whether it was appropriate to elect to abstain. The court

8

may elect to abstain sua sponte. *Front Royal & Warren Cnty. Indus. Park Corp. v. Town of Front Royal, Va.*, 945 F.2d 760, 763 (4th Cir. 1991) ("[W]e may apply the abstention doctrine at our own instance even if no party urges the doctrine upon us."). The Fourth Circuit recently noted that "even where jurisdiction is not discretionary, courts may abstain from exercising jurisdiction under certain circumstances that may intrude on the prerogative of state courts." *Trustgard Ins. Co. v. Collins*, 942 F.3d 195, 201-02 (4th Cir. 2019) (citing to the Supreme Court's decisions in *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976); *Younger v. Harris*, 401 U.S. 37 (1971); *Louisiana Power & Light Company v. City of Thibodaux*, 360 U.S. 25 (1959); *Burford v. Sun Oil Company*, 319 U.S. 315 (1943); and *Railroad Commission of Texas v. Pullman Company*, 312 U.S. 496 (1941)).

In *Thibodaux*, the Supreme Court held that federal courts sitting in diversity may abstain from ruling upon a "doubtful and unsettled" question of state law that is "intimately involved with sovereign prerogative" and await the question's resolution in the state courts, in order to avoid "mak[ing] a dubious and tentative forecast" regarding the answer. *Thibodaux*, 360 U.S. at 27 n.2, 28-29; *see Colo. River*, 424 U.S. at 814 (*Thibodaux* "[a]bstention is . . . appropriate where there have been presented difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar." (citing *Thibodaux*)). *Thibodaux* abstention is undertaken "in regard for the respective competence of the state and federal court systems and for the maintenance of harmonious federal-state relations in a matter close to the political interests of a State[,]" and is applicable to both legal and equitable claims. *Thibodaux*, 360 U.S. at 29.

The Fourth Circuit has said that *Thibodaux* abstention is appropriate in diversity cases where: (1) state law is unsettled, and (2) an incorrect federal decision might embarrass or disrupt

significant state policies. *Nature Conservancy v. Machipongo Club, Inc.*, 579 F.2d 873, 875 (4th Cir.) (per curiam), *cert. denied*, 439 U.S. 1047 (1978). In *Machipongo*, a case involving a dispute about ownership of a beach-access road in Virginia, the Fourth Circuit ruled that *Thibodaux* abstention was appropriate for the following reasons:

> Abstention in this case is proper with regard to the issues of statutory interpretation that relate to the ownership of the beaches and the meadow and marshlands. The interpretation of the statutes [at issue] is unsettled, so a federal court would be required to reach its judgment without any guidance from the authoritative tribunal, and the issue of the ownership of the beaches and meadow and marshlands raises fundamental questions of public policy that should be resolved in the first instance by the state courts. With respect to the ownership of the beaches, meadow and marshlands, we are not unmindful that an incorrect federal decision might adversely affect property owners throughout all of Virginia's coastal regions.

*Id.* at 875-76. The *Machipongo* court accordingly remanded the case to the district court with instructions to stay its judgment pending a final decision by the Supreme Court of Virginia on the statutory-interpretation issues. *Id.* (noting that "a definitive decision by the Virginia courts on the statutory issues relating to the ownership of the beaches and the meadow and marshlands will be forthcoming" given that a complaint had already been filed in state court raising the same issues).

Furthermore, regulation of the insurance industry is a sovereign prerogative that Congress has expressly reserved to the states, see 15 U.S.C. §§ 1011-12 ("Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States."), because of the states' fundamental interests in protecting their citizens, see *Haisten v. Grass Valley Med. Reimbursement Fund, Ltd.*, 784 F.2d 1392, 1406 (9th Cir. 1986) (recognizing "the strong state interest in regulating insurance which concerns the 'lives and limbs' of the public"). That North Carolina considers it important to regulate its insurance industry is demonstrated by the fact that the North Carolina General Assembly felt it necessary to enact N.C. Gen. Stat. § 58-58-120 to impose on life insurance

10

companies certain prerequisites before forfeiting policies. Accordingly, the state policy here at issue is clearly significant within the meaning of *Machipongo*, and has "substantial public import . . . transcend[ing] the result in the case . . . at bar." *Colo. River*, 424 U.S. at 814 (describing the state policies that implicate *Thibodaux* abstention); *see Charleston Area Med. Ctr. v. Blue Cross & Blue Shield Mut.*, 6 F.3d 243, 250 n.5 (4th Cir. 1993) (noting in *obiter dictum* that "[w]e are troubled by the district court's alleged abuse of discretion in denying the defendant's motion to abstain" because, *inter alia*, the "case by necessity entails an analysis of the regulation of the insurance industry in West Virginia—a complex state statutory scheme involving policy problems of substantial public import and state interest. We believe this case presents precisely the type of litigation in which federal courts should carefully consider abstaining."); *see also Hartford Cas. Ins. Co. v. Borg-Warner Corp.*, 913 F.2d 419, 426 (7th Cir. 1990) (affirming *Burford* abstention in an insurance-regulation dispute: "The importance of the state policies at issue, however, go far beyond the present litigation. It is these larger policies that we must consider, and not the comparatively small stakes of this litigation.").

This court has previously applied *Thibodaux* abstention in the insurance context and stayed damages actions accordingly. *See Columbus Life Ins. Co. v. Wells Fargo Bank, N.A.*, No. 4:20-cv-00041-M, 2020 WL 7232082, at \*6-8 (E.D.N.C. Dec. 8, 2020) (applying the doctrine to counterclaims after discretionary refusal to hear declaratory claims in the first instance); *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 730-31 (1996) ("[W]e have permitted federal courts applying abstention principles in damages actions to enter a stay, but we have not permitted them to dismiss the action altogether . . . federal courts have the power to dismiss or remand cases based on abstention principles only where the relief being sought is equitable or otherwise discretionary."). However, given that Plaintiff elected to file suit in this court and no forthcoming

North Carolina decision on the issue is apparent, rendering a stay of this proceeding futile, the court will proceed to the merits.

### 2. North Carolina Law Governs the Policy

Plaintiff maintains that North Carolina law governs the Policy. *See, e.g.*, DE-38 at 7-8. Defendant argues that it was not required to comply with the particular North Carolina statute that is the subject of the cross motions for summary judgment because at the time the November 7th notice was sent, Mrs. Whitmire—as owner of the Policy and the life insured—did not reside in the state of North Carolina. *See, e.g.*, DE-42 at 10.

A district court exercising diversity jurisdiction must apply the choice-of-law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941). Pursuant to North Carolina's choice-of-law rule,

> the substantive law applicable in a contract case is the law of the place where the contract was made. A contract is made in the place where the last act essential to making the contract occurred. Phillips, a New York resident at the time of the contract, completed the application for life insurance in New York and entered into the insurance contract in New York with Transamerica, a New York corporation with its principal place of business in New York. Therefore, New York law governs the interpretation of the policy.

*Transamerica Fin. Life Ins. v. Smith*, No. 5:09-CV-20-BO, 2009 WL 10689830, at *2 (E.D.N.C. Dec. 15, 2009) (citations omitted); *see also* N.C. Gen. Stat. § 58-3-1 ("All contracts of insurance on property, *lives*, or interests in this State shall be deemed to be made therein, and all contracts of insurance the applications for which are taken within the State shall be deemed to have been made within this State and are subject to the laws thereof.") (emphasis added); *Cont'l Cas. Co. v. Physicians Weight Loss Ctrs. of Am., Inc.*, 61 F. App'x 841, 844-45 (4th Cir. 2003) (unpublished) ("Because of constitutional concerns, application of this provision [§ 58-3-1] has been limited to situations where there is a 'close connection' between North Carolina and the interests insured by the policy.") (citation omitted).

Here, the application for life insurance was made in the state of North Carolina and therefore the resulting contract became subject to the laws of the state, pursuant to the plain terms of North Carolina General Statute Section 58-3-1. North Carolina is also the location where most of the premium payments were made over the course of the Policy's eleven-year history, where the Plaintiff and Mrs. Whitmire resided for most of that period, and where the Policy servicing agent was located. This sufficiently establishes the requisite close connection between the insured's interests and North Carolina.

### 3. North Carolina Law Generally Favors a Finding of Coverage

North Carolina "follow[s] the rule that provisions of insurance policies and compulsory insurance statutes which extend coverage must be construed liberally so as to provide coverage, whenever possible by reasonable construction." *State Cap. Ins. Co. v. Nationwide Mut. Ins. Co.*, 318 N.C. 534, 538, 350 S.E.2d 66, 68 (1986) (citations omitted). An insurer must comply with statutorily prescribed notice requirements prior to terminating an insured's life insurance policy for non-payment of premiums. *Aiken v. Atl. Life Ins. Co.*, 173 N.C. 400, 408, 92 S.E. 184, 188 (1917). Proper notice is a condition precedent to declaring an insurance policy forfeited or lapsed. *Garland v. Jefferson Standard Life Ins. Co.*, 179 N.C. 67, 101 S.E. 616 (1919); *see also Wiles v. Nationwide Life Ins. Co.*, 334 F.2d 296, 302 (4th Cir. 1964) ("Courts are reluctant to declare the forfeiture of an insurance policy. . . . That the Supreme Court of North Carolina shares in this general reluctance in cases involving payment or nonpayment of premiums is amply demonstrated by its decisions.") (citations omitted).

### 4. North Carolina Rules of Statutory Construction

The North Carolina Supreme Court has counseled that the "primary endeavor of courts in construing a statute is to give effect to legislative intent." *State v. Beck*, 359 N.C. 611, 614, 614

13

S.E.2d 274, 276-77 (2005). Ascertaining legislative intent is achieved by first considering the words chosen by the legislature. *O & M Indus. v. Smith Eng'g Co.*, 360 N.C. 263, 267-68, 624 S.E.2d 345, 348 (2006) (citation omitted). When the words chosen are clear and unambiguous, they are given their plain and definite meaning. *Beck*, 359 N.C. at 614, 614 S.E.2d at 277. However, "[t]he Court may also consider the policy objectives prompting passage of the statute and should avoid a construction which defeats or impairs the purpose of the statute." *O & M Indus.*, 360 N.C. at 268, 624 S.E.2d at 348.

### B. N.C. Gen. Stat. § 58-58-120 and Notice Sent by Defendant

The relevant statute creates a one-year grace period for life insurance policies if the insurer fails to send the required notice ahead of a premium's upcoming due date indicating the date the premium payment is due and that the failure to pay the premium can result in the policy's forfeiture. N.C. Gen. Stat. § 58-58-120. There are specific time periods within which this notice must be sent—both occurring before the premium itself is due[2]—depending on whether or not the policy contains a grace period. *Id.*; *see Cent. Carolina Bank & Tr. Co. v. Sec. Life of Denver Ins. Co.*, 247 F. Supp. 2d 791, 798 (M.D.N.C. 2003) ("Accordingly, because the May 15 Premium Notice is the only notice that was sent prior to the premium due date, in determining whether Defendant complied with the statutory requirements of [N.C. Gen. Stat.] Section 58-58-120, the court will refer to only the May 15 Premium Notice.").

The full text of the statute is set for below, with terms relevant to the instant motions underlined:

---

[2] Plaintiff incorrectly contends that the lapse notice required by the statute "is only generated *after* a premium payment is missed, so there is no issue of an insured not being notified of a payment being due." DE-45 at 12 (emphasis added).

14

No life insurance corporation doing business in this State shall, within one year after the default in payment of any premium, installment, or interest, declare forfeited or lapsed any policy hereafter issued or renewed, except policies on which premiums are payable monthly or at shorter intervals and except group insurance contracts and term insurance contracts for one year or less, nor shall any such policy be forfeited or lapsed by reason of nonpayment, when due, of any premium, interest, or installment or any portion thereof required by the terms of the policy to be paid, within one year from the failure to pay such premium, interest, or installment, unless a written or printed notice stating the amount of such premium, interest, installment, or portion thereof due on such policy, the place where it shall be paid, and the person to whom the same is payable has been duly addressed and mailed, postage paid, to the person whose life is insured, or to the assignee or owner of the policy, or to the person designated in writing by such insured, assignee or owner, if notice of the assignment has been given to the corporation, at his or her last known post-office address in this State, by the corporation or by any officer thereof or person appointed by it to collect such premium, at least 15 and not more than 45 days prior to the day when the same is payable, as regards policies which do not contain a provision for grace or are not entitled to grace in the payment of premiums and at least five and not more than 45 days prior to the day when the same is payable as regards policies which do contain a provision for grace or are entitled to grace in the payment of premiums. The notice shall also state that unless such premium, interest, installment, or portion thereof then due shall be paid to the corporation or to the duly appointed agent or person authorized to collect such premium, by or before the day it falls due, the policy and all payments thereon will become forfeited and void, except as to the right to a surrender value or paid-up policy, as in the contract provided. If the payment demanded by such notice shall be made within its time limit therefor, it shall be taken to be in full compliance with the requirements of the policy in respect to the time of such payment; and no such policy shall in any case be forfeited or declared forfeited or lapsed until the expiration of 30 days after the mailing of such notice. The affidavit of any officer, clerk, or agent of the corporation, or of anyone authorized to mail such notice, that the notice required by this section has been duly addressed and mailed by the corporation issuing such policy, shall be presumptive evidence that such notice has been duly given. No action shall be maintained to recover under a forfeited policy unless the same is instituted within three years from the day upon which default was made in paying the premium, installment, interest, or portion thereof for which it is claimed that forfeiture ensued.[3]

N.C. Gen. Stat. § 58-58-120.

---

[3] The court notes for the record that more than three years lapsed between the date of the default in paying the premium, November 23, 2016, DE-40 ¶ 23, and the date the instant action was instituted by the Plaintiff, January 16, 2020, DE-1.

As an initial matter, the court must determine which of the notices mailed by Defendant is relevant to determining whether Defendant complied with the statutory requirements. The plain language of the statute states that for policies with grace periods, such as this one, notice of non-payment must be sent "at least five and not more than 45 days *prior* to the day when the [premium] is payable." N.C. Gen. Stat. § 58-58-120 (emphasis added). Because the statutorily required notice must be sent *before* a premium payment is due, the statute necessarily affects all premium payment notices because an insurer has no way to know ahead of time which particular premium payment may be missed by the insured—if that insurer wants the ability to successfully forfeit the policy based on the non-payment of a premium before the otherwise applicable one-year grace period.

The premium that Plaintiff failed to pay was due on November 23, 2016. DE-40 ¶ 23. Defendant timely mailed the November 23 Premium Notice on November 7, 2016, *id.* ¶ 22, sixteen days before the premium was due. The other notices mailed by Defendant, namely the December 28, 2016, notice (noting that the Policy's grace period had expired and extending a "special offer" if the premium was received by January 22nd), and the January 27, 2017, notice (stating that the Policy lapsed with an invitation to apply to reinstate coverage) were sent after the due date of the November 23, 2016, premium. *Id.* ¶¶ 24-26. Despite the Plaintiff's arguments to the contrary,[4] because the November 7th Premium Notice is the only notice that was sent prior to the premium's due date, this is the relevant notice in determining whether Defendant complied with the statutory requirements of Section 58-58-120. That Defendant sent the required notice is not in question. This case turns on whether or not Defendant complied with the statute when it sent the required

---

[4] Plaintiff seems to indicate that the relevant notice is the one sent on December 28, 2016, in response to the missed premium payment, see DE-38 at 11, and also argues that it "has provided no position on where premium payment notices must be sent," DE-45 at 12. However, the statute necessarily implicates where premium payment notices must be sent—if an insurer wishes to successfully terminate a policy within one year of nonpayment.

notice to Mrs. Whitmire's South Carolina address as opposed to her last-known address in North Carolina.

>    C. No North Carolina Caselaw Interpreting the Relevant Phrase: "Last Known Post-Office Address in This State"

In the first instance, the court notes that there is a dearth of North Carolina caselaw citing, let alone interpreting, Section 58-58-120. One federal district court in North Carolina, when called upon to determine the adequacy of a notice and use of the required language that non-payment of the premium will result in the policy being forfeited and void, discussed the legislative intent behind this statute:

> The legislature by enacting Section 58–58–120 established certain criteria that must be complied with prior to declaring an insurance policy lapsed or forfeited. . . . *The clear import of this statutory requirement is to place the policy owner on notice of the consequences of non-payment of the premium.*

*Cent. Carolina*, 247 F. Supp. 2d at 799 (emphasis added).

While Plaintiff argues that the North Carolina Supreme Court's 1919 decision in *Garland v. Jefferson Standard Life Insurance Co.* is directly on point, see, e.g., DE-38 at 8-10, the court agrees with the Defendant's argument to the contrary, see, e.g., DE-48 at 5-9. Though the *Garland* court recited a jury instruction that indicated that the company's notice of premium payment due was not in compliance with the statute because it was sent to the insured's address in Alabama, not North Carolina, this instruction was not appealed, and therefore not assessed by the court. *Garland*, 179 N.C. at 70, 101 S.E. at 618 ("[T]he only notice purporting to be given of the portion of the premium the defendant alleges to be due by the plaintiff in this case was mailed, not to the last address in this state of the plaintiff, but was mailed to Montgomery, Ala., and the court instructs the jury that, under the law, such notice was not properly made."). The court has not found any North Carolina case interpreting the phrase "last known post-office address in this state" as used in Section 58-58-120.

17

A federal district court making determinations based on North Carolina state law must predict how the Supreme Court of North Carolina would rule on any disputed state law issues. *Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C.*, 433 F.3d 365, 369 (4th Cir. 2005). When there does not appear to be a North Carolina Supreme Court case precisely on point, this court may consider the opinions of the North Carolina Court of Appeals, treatises, and the practices of other states. *Id.* In predicting how the Supreme Court of North Carolina would address an issue, this court "should not create or expand a [s]tate's public policy." *Time Warner Ent.- Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp.*, 506 F.3d 304, 314 (4th Cir. 2007).

The court identified an instructive case from the North Carolina Court of Appeals. In *Allstate Insurance Co. v. Nationwide Insurance Co.*, that court was asked to review the denial of motions for directed verdict and determine whether the insurer, required to mail an automobile insurance cancellation notice to the insured's "last known address," effectively cancelled the policy by mailing the notice to the last residence address provided by the insured. 82 N.C. App. 366, 367, 346 S.E.2d 310, 311, *review denied*, 318 N.C. 505, 349 S.E.2d 858 (1986). While N.C. Gen. Stat. § 58-58-120 was not applicable, the policy itself contained a requirement: "2. We may cancel the Liability and Uninsured Motorists Coverages by mailing to the named insured shown in the Declarations at the last known address: a. at least 15 days notice if cancellation is for nonpayment of premium . . . . " *Id.* The court determined that the term "last known address" was unambiguous and therefore a question of law to be determined by the court, rather than a jury. *Id.* at 368, 346 S.E.2d at 311. "Giving the words their usual and ordinary meaning, we interpret the phrase 'last known address' to mean the most recent mailing address known to the insurer." *Id.* at 370, 346 S.E.2d at 312. After the insured's relevant move, he did not notify the insurer, did not

18

notify the post office of his change of address, and did not pick up mail at his old address. *Id.* at 368, 346 S.E.2d at 311. The court reasoned that "[u]nless the insured had notified Allstate of his second change of address, or unless Allstate had actual knowledge of the change, mailing of the notice to the last residence address provided by insured was proper and effective." *Id.* at 371, 346 S.E.2d at 313. Interpreting "last known address" as "the most recent mailing address known to the insurer," *id.* at 370, 346 S.E.2d at 312, implies the possible existence of a new address, unknown to the insurer. Because the insurer had no knowledge of the new address, it could not be held responsible for failing to send a notice to a place it did not know existed.

D.  Treatises and the Practices of Other States

According to one treatise on the law and practices governing insurance issues, "[t]here is a conflict of authority as to whether the insurer, where it knows of a change of the insured's address, may or must send a cancellation notice to such new address prior to being so directed by the insured. By one view, the insurer is required to conclude that the insured desires that the mail be sent to him or her at the new address. . . . By the other view, the insurer is required to continue to honor the original address until directed by the insured to do otherwise." Couch on Ins. § 32:25 Address to which mailed—Insurer's knowledge of changed address (3d ed. 2020). The court has been unable to determine which view is preferred in North Carolina.

As raised by the parties, New York has a similar statute applicable to life insurance policies with identical language requiring notice to be sent to the "last known post office address in this state."[5] *Napier v. Bankers' Life. Ins. Co.*, 100 N.Y.S. 1072, 1074 (N.Y. Sup. Ct. 1906). The *Napier* trial-level court analyzed the meaning of these words and surmised four possible constructions:

---

[5] The current version of the New York statute, last amended in 2008, now requires the notice of premium due to be mailed "to the last known address of the policyowner . . . ." N.Y. Insurance Law § 3211(b)(1) (McKinney 2021).

[1] First, that no life insurance company doing business within this state could, under any circumstances, forfeit or declare lapsed a policy issued upon the life of a nonresident of this state, since in such case no notice could be sent to the post-office address of the insured in this state, as the insured had no such address. That would be a construction entirely contrary to reason, since the result of it would be to afford better protection to persons who were not residents of the state of New York than to those who resided there. The Legislature cannot be presumed to have been more solicitous for the welfare of nonresidents than for that of its own citizens.

[2] The second construction suggested is that the notice must be mailed in this state, although addressed to the persons entitled to receive the same at any place which was their last known post-office address, whether in this state or elsewhere. Inasmuch as this statute is applicable, not only to domestic insurance companies, but to foreign companies doing business within this state, the effect of such construction would be to require such companies to bring their forfeiture notices into the state of New York for the purpose of mailing them, not only to persons residing within that state, but to persons residing in other states of the Union, or even in foreign countries. No possible reason can be suggested why the Legislature should have been concerned with the place where the notices were to be mailed. The important thing is that the notices should be received by the persons interested in them. It is quite possible that if the notice had been personally served upon the defendant in this state, so that the [sic] had received it within the time prescribed in this statute, whether such service was made at his last known post-office address or elsewhere, it would have been sufficient to enable the defendant to declare the policy forfeited. The purpose of the statute relates rather to the fact of notice, and the kind of notice, than to the manner in which the notice was delivered.

[3] The third construction suggested is that the words "in this state" in the statute should be read as if they were "in the state of the insured." It seems hardly possible that the Legislature of the state of New York[,] in adopting a statute relative to contracts within that state, in using the words "in this state" should be held to mean by them, not only in the state of New York, but every other state of the Union.

[4 The last construction is] that the statute applied only to New York contracts, made with persons having a known post-office address in that state. This last construction seems to be the reasonable and natural one for several reasons. The amendment to the insurance law of 1897 was intended to enlarge the powers of insurance companies doing business within this state to declare forfeitures and not to limit it. This becomes apparent when we consider the entire amendment then adopted. The first step in the direction of enlarging the power of such companies was a provision that the restriction as to declaring a policy forfeited terminated one year after the default in payment of any premium. The second provision for the benefit of such companies was one providing that no action should be maintained to recover under a forfeited policy, unless instituted within one year from the day on which default was made in paying the premium for which it is claimed that forfeiture ensued. Such being the general policy and intent of the amendment as

indicated by these provisions, the remainder of the statute as amended, including the words "in this state," should also be so construed as to relieve the insurance company from restriction as to forfeitures rather than to make such restriction bear more heavily than it did before.

*Id.* at 1074-76 (citations omitted). The court ultimately concluded that the requirement to mail notice to the last known address in the state was not applicable to an insured who lived in Chicago at the time the life insurance policy was issued, lived there until his death, and at no point in time ever had a New York address. *Id.* at 1073. "[T]he defendant company was under no obligations by reason of the provisions of the statute to serve any notice upon the insured, and, in the absence of such statutory obligation, the company had the right to declare the policy forfeited and lapsed when the premium was not paid in accordance with the terms thereof." *Id.* at 1076. The court noted that the applicable statute had recently been amended to include the phrase "last known post office address in this state" and took that into consideration when predicting legislative intent, concluding the intent was "to enlarge the powers of insurance companies . . . to declare forfeitures," *id.* at 1075.

Tangentially analogous caselaw from other jurisdictions suggests that sending the relevant notice to Mrs. Whitmire's South Carolina address was proper and effective. *See Clark v. Progressive Max Ins.*, No. 04CA597, 2005 WL 1245474, at *1, *5 (Ohio Ct. App. May 23, 2005) (finding that information about the insured's new address obtained from a USPS forwarding address label can be a proper way to obtain an individual's last known address and that auto-insurance cancellation notice sent there was effective); *Merrimack Mut. Fire Ins. Co. v. Scott*, 240 S.W.2d 666, 668 (Ark. 1951) ("There is another rule, which appears to be well recognized, to the effect that where notice of the insured's change of address has been sent to the insurer, or knowledge thereof has been acquired by its agents, a notice to the insured at the address originally stated in the policy is not effective to bind him as to the consequences thereof, at least in the

21

absence of actual receipt of such notice or effective knowledge thereof."); *but see Columbia Cas. Co. v. Wright*, 235 F.2d 462, 463, 465-66 (4th Cir. 1956) (finding that despite the insurer's actual knowledge of a change of address via a third-party—though the move had not yet taken place— an auto-insurance cancellation notice sent to the new address was ineffective when the policy required the notice to be sent to the "address shown in policy," which was the old address); *Monaghan v. Adkins*, 117 F. App'x 923, 925-26 (5th Cir. 2004) (unpublished) (applying Mississippi law to determine that a life-insurance cancellation notice sent to an old address was effective where insured never informed insurer that his address changed and insurer had opted into National Change of Address Program sponsored by USPS and was not informed of the move, therefore establishing insurer's entitlement to the presumption of delivery arising under Mississippi law); *Sbarbora v. Equitable Life Asssur. Soc. of U.S.*, 14 N.Y.S.2d 295, 295-97 (N.Y. Sup. Ct. 1937) (finding that a life insurance cancellation notice sent to an old address was effective because that was the contractually agreed upon address to send notices to and insured did fill out a change-of-address form at the post office, mail was forwarded to him, and there was evidence of actual receipt of notice).

## E. Application

Taking all of the above into consideration, and notwithstanding North Carolina's general position favoring coverage, the court finds that Defendant was required to comply with N.C. Gen. Stat. § 58-58-120 and that it did in fact comply with the statute's requirements by sending the notice of nonpayment of premium to Mrs. Whitmire at her most recent mailing address known to the insurer, which happened to be in South Carolina.[6] While the parties focus on the clause "in this

---

[6] The court need not answer Defendant's call to invoke the absurdity doctrine in its interpretation of the statute. The court notes not only the separation-of-powers concerns present in any statutory interpretation matter, but the additional concerns present when a federal court is being asked to find an absurd result in a state statute. *Aubrey v. Barlin*, 159 F. Supp. 3d 752, 759 (W.D. Tex. 2016). Furthermore, the dispute about where Mrs. Whitmire was actually living at

22

state" the court finds that the term "last known" deserves more weight. As the North Carolina Court of Appeals did in *Allstate*, giving the words "last known post-office address in this state" their usual and ordinary meaning necessarily implies the existence of a new address *unknown* to the insurer. In such a case, an insurer would be required to send notice to the most recent mailing address in North Carolina known to the insurer. Where, however, an insurer has actual knowledge of the changed address[7]—whether that new address is in the state of North Carolina or elsewhere— the insurer should be required to mail notice to that new, *known* address.[8] This reading of the statute is in keeping with the legislative goal of ensuring that the policy owner is on notice of the consequences of non-payment of the premium. As the *Napier* court explained "[t]he purpose of the statute relates rather to the fact of notice, and the kind of notice, than to the manner in which the notice was delivered." *Napier*, 100 N.Y.S. at 1075. A contrary reading would elevate form over substance. Because Defendant provided the required notice on November 7, 2016—by sending it to her most recent mailing address known to the insurer and which, based on the facts, was actually received by Mrs. Whitmire—and no action was taken in response to it (or the two subsequent notices Defendant sent), Defendant properly forfeited the Policy prior to Mrs.

---

the time the notice was sent is immaterial. The insurer can only be required to mail correspondence to the most recent address known to it—via the USPS or otherwise—and here Defendant did just that.

[7] Plaintiff repeatedly emphasizes that Defendant was never directly informed by anyone in the Whitmire household to change the address for correspondence associated with the policy. *See, e.g.*, DE-45 at 14. However, individuals and businesses alike rely on USPS change-of-address information being distributed precisely to avoid the burden that would result if personal notification of a change of address was required in every instance. Even the Internal Revenue Service relies on USPS change-of-address information. *See* 26 C.F.R. § 301.6212-2(b)(2) ("The IRS will update taxpayer addresses maintained in IRS records by referring to data accumulated and maintained in the United States Postal Service (USPS) National Change of Address database . . . .").

[8] The court also notes that the USPS implements mail forwarding upon a permanent change-of-address order. *See* Mailing Standards of the United States Postal Service Domestic Mail Manual 507.2.1.1 ("Records of permanent change-of-address orders are kept by city delivery Post Offices for 18 months, for forwarding and for address correction purposes, from the end of the month when the change takes effect."), *incorporated by reference*, 39 C.F.R. §§ 111.1, 211.2. Had Defendant mailed the November 7, 2016, notice to Mrs. Whitmire's address in North Carolina, it most likely would have been forwarded to her new address in South Carolina due to the change-of-address order she made in May 2016, see DE-40 ¶ 16.

23

Whitmire's demise on March 10, 2017. To hold otherwise would place the Defendant in a worse position than an insurer who sent notice to an address it knew to be outdated.

Because there is no valid claim to insurance coverage, Plaintiff's claims for declaratory judgment that the Policy is in full force and effect (count 1), breach of contract (count 2), breach of implied covenant of good faith and fair dealing (count 4), and unfair or deceptive trade practices (count 6) cannot be maintained and will therefore be dismissed. *See Troutman v. QBE Ins. Corp.*, No. 3:17-CV-464, 2018 WL 2741060, at *2, *5-*6, *8 (W.D.N.C. June 7, 2018) (concluding that defendant insurance company could not have engaged in breach of contract, bad faith, or unfair and deceptive trade practices premised on the denial of additional benefits under the homeowner's insurance policy where the policy was subject to a valid endorsement that limited plaintiff's claim to $10,000); *see also Rogers v. Unitrim Auto & Home Ins. Co.*, 388 F. Supp. 2d 638, 643 (W.D.N.C. 2005) ("Having concluded above that even in the light most favorable to the Plaintiffs, their loss was excluded from coverage under American's homeowner's policy, their claim for unfair and deceptive trade practices must also necessarily fail."); *Cent. Carolina*, 247 F. Supp. 2d at 800-04 (M.D.N.C. 2003) (finding that where the insurer had a reasonable basis for denying coverage, insured could not recover on a claim for unfair and deceptive trade practices). In addition, Plaintiff's claim for unjust enrichment (count 3), where the law implies a contract, also fails as a matter of law because such a claim cannot be maintained in an instance such as this where the dispute arises from a contractual relationship between the parties. *Metric Constructors, Inc. v. Bank of Tokyo-Mitsubishi, Ltd.*, 72 F. App'x 916, 920 (4th Cir. 2003) (unpublished) ("An unjust enrichment claim is available only in the absence of an express contract between the parties."). Finally, Plaintiff cannot maintain a cause of action for bad faith in refusing to settle an insurance claim (count 5) where there is no valid, recognizable claim in the first instance. *Lovell v.*

*Nationwide Mut. Ins. Co.*, 108 N.C. App. 416, 420, 424 S.E.2d 181, 184 (1993) ("In order to recover punitive damages for the tort of an insurance company's bad faith refusal to settle, the plaintiff must prove (1) a refusal to pay after recognition of a valid claim, (2) bad faith, and (3) aggravating or outrageous conduct.") (citations omitted).

IV.     Conclusion

For the reasons discussed above, the Plaintiff's motion [DE-35] is DENIED and the Defendant's motion [DE-39] is GRANTED. The Clerk of Court is DIRECTED to close the case.

SO ORDERED this the 10ᵗʰ day of May, 2021.

_____
RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE